10304

HOOKER v. HOOKER.

(105 S. E. 701.)

1. DEEDS—PRESUMPTION OF UNDUE INFLUENCE ARISES FROM RELATION OF
PARENT AND CHILD.—In a mother's action to set aside a deed to her
son, a Court ruling that there was no presumption of undue influ-
ence arising from the relation of parent and child, and that the bur-
den of proof rested upon the plaintiff, was reversible error.

2. DEEDS—EVIDENCE HELD TO SHOW UNDUE INFLUENCE.—In a mother's
action to cancel a deed to her son, evidence *held* to show undue influ-
ence.

Before WHALEY, J., County Court, Richland. Septem-
ber, 1918. Reversed.

Action by Belinda C. Hooker against H. Kennerly Hooker
and another, in which, upon plaintiff's death, Joel J. Hooker
was substituted as plaintiff. Decree dismissing the com-
plaint, and plaintiff appeals.

This action was commenced on the —— day of July,
1917, by Belinda C. Hooker against her son, H. Kennerly
Hooker, and Gertrude Nathans, as defendants, for the can-
cellation of a deed of conveyance executed by Belinda C.
Hooker to H. Kennerly Hooker, dated the 7th of June,
1915.

Belinda C. Hooker died about the 5th of February, 1918,
leaving of force her last will and testament, whereby she
devised and bequeathed to her husband, Joel J. Hooker, all
her property of every kind and description whatsoever.
After her death Joel J. Hooker was substituted as party
plaintiff; and the case was heard upon testimony taken in
open Court without a reference. His Honor, the County

NOTE: On presumption and burden of proof as to undue influence
respecting gift inter vivos from parent to child, see note in 35 L. R. A.
(N. S) 944.

Judge, rendered a decree sustaining the validity of the deed, and dimissing the complaint, from which the plaintiff appealed.

The testimony of Mrs. J. B. Salley, a witness for the plaintiff, is as follows:

"Mrs. Belinda C. Hooker and Mr. Joel J. Hooker are my mother and father. H. Kennerly Hooker is my brother. We are the only children except a half sister, Mrs. Estelle Joyner, who is a daughter of Joel J. Hooker by his first marriage. I have no interest in the property involved in this suit, and I have never tried to procure an interest therein. My parents have been living with me for the past 12 or 15 years, with the exception of about 2 or 3 years when they lived in Columbia, in the house involved in this suit. They then moved to my brother's home, H. Kennerly Hooker, near North, and stayed there about 2 or 3 months. Then they came back to my home, and have remained there ever since, until my mother's death, and my father is still living with me. During all the time they stayed with me I supported them. My father has been in bad health for about 20 years, and has been unable during that time to work. My mother has also been in bad health for about 20 years. She has Bright's disease, and was practically an invalid. She died February 5, 1918, and was 71 when she died. My father is 77 or 79 years old. The house and lot in Columbia involved in this suit was the only property they had. I do not know anything about the transaction between my brother and mother about the deed to the house and lot in Columbia, as I was not present when it occurred. My mother and father were staying at my brother's when the deed was made. The only statement I have heard my brother make about that transaction, was after my mother's death he came to my house to see my father, and asked me

if I wanted half of the property, and I told him I did not. He then asked me something concerning the rent, and said he was glad mother was dead; that he would have had to gotten up in Court and make her out a falsehood. My brother was not present when my mother died, nor was he present at the funeral, although I sent him word of her death. He never visited my mother while she was at my home after she left his house to come and live with me. My mother had her right mind, but was in very bad health. She was very forgetful and very childish. She was dependent upon some one else than herself for guidance. Q. Who did she usually depend upon for direction? A. Why, she usually asked me for advice sometimes; I guess those she was with. She was living with my brother, H. Kennerly Hooker, in June, 1915. That is the time the alleged deed was made to him for this property. She had been living in this house in Columbia, when she moved near North to live with my brother. Shortly after she signed this paper to my brother she and my father came to live with me. I don't know whether she could understand business transactions or not. Mother had a mind, but it was very little and she was very feeble. She was an invalid for at least 15 years. My mother was in possession of the premises until her death, and still is in possession. She never turned over possession to my brother."

No cross-examination.

Miss Jessie Joyner, witness for plaintiff, thus testified:

"Mrs. Belinda C. Hooker was my step-grandmother. I was present at my home when she signed the deed. She was there on a visit. Uncle Kennerly Hooker came in and brought her a paper. I was passing as he came in, and he asked me, 'Do you mind witnessing this signature?' Mr. W. H. Stabler was there with him. The paper was not

read over to my grandmother, so far as I know, nor was any statement made as to what it was when she signed it. I did not know myself what kind of paper I was witnessing. No one informed me what it was."

Joel J. Hooker, the plaintiff, testified as follows:

"I was the husband of Belinda C. Hooker, and as devisee under her will I am the plaintiff in this action since her death. My wife was in possession of this property until her death. I acted as her agent in renting it. Since her death I have been in possession. I am 76 years old. My wife was 70 or 71 when she died. My wife's health in her latter days was bad. She had Bright's disease, or something of that sort; she was in bad shape. Q. What effect did it have upon the normal condition of her mind? A. Well, it was bad; sometimes she was in bad shape, bad fix. Sometimes she didn't know anything hardly. I think it did affect her in business transactions. I tried to direct her, and tell her, and carry on her business matters, and manage them for her. Sometimes she appealed to Mrs. Salley, her daughter. I don't think she ever appealed to her son, H. Kennerly Hooker, for advice. I and my wife were living in Columbia, in our own home we had bought and built on, until 1915, when our son, H. Kennerly Hooker, told us if we would go and live with him he would support and take care of us. We went. After we got there he asked my wife to sign a little paper to keep Mrs. Salley from interfering with the will. He fooled her to sign a title. I found out after it was done. My wife had made a will in favor of H. Kennerly Hooker. By some means or other my wife found out that she had signed a title to her property in Columbia instead of a paper requesting her daughter, Mrs. Salley, not to interfere with her will, and she demanded back the title from her son. Then he threw the paper in her lap, saying,

'I hope now you are satisfied.' Q. What was that paper? A. Well, it was the bogus title, I suppose, the fraudulent title, nothing but a fraud, a swindle. I saw the paper after he threw it in her lap. I found it was a deed for that house and lot in Columbia, a title paper. I then inquired and found the paper recorded here in Columbia. Before this paper was signed I was not consulted about it by any one. I was not present when it was signed. After my wife demanded the title back my son told us to leave. Q. Told you that you had to leave? A. Leave then, right then, after he had everything we had in the world, and we had nothing, both broke, had nothing under the canopy of heaven any more, to get out and go. We then went to our daughter's, Mrs. Salley, where we have been ever since. She had us to support after Kennerly had everything we had."

W. H. Stabler, a witness for the defendant, thus testified:

"Have known Mrs. Hooker all my life. She is a woman above ordinary intelligence. I saw no change in her condition that afternoon. She appeared as I had always known her. Nothing was said that afternoon about the paper being a paper to secure breaking the will that had been made."

Cross-Examination: "Nothing was said about the kind of paper it was, except Mr. Hooker stated he wanted us to witness this deed. Mr. Hooker asked me to come there to witness a deed. I knew nothing about the transactions between Mr. and Mrs. Hooker. She could not have read it in the time she took to open it up. She glanced at it and signed it at the proper place. It was not read to her. Mr. Hooker did not say anything to her, just handed her the paper. Mr. Kennerly Hooker took the paper, and the next time I saw it was at Mr. Stabler's. That is all I know about the transaction."

Dr. M. L. Brogdon, witness for defendant, testified:

"I am a practicing physician; I live at Swansea, S. C. Have been practicing about nine years. I knew Mrs. Belinda C. Hooker; I remember when she died. During the last few years of her life I saw her several times during the year, but not professionally. I have given her medicine several times. I have talked with her, and observed her, and I have never seen anything wrong with her mind. Her mind was clear every time I have seen her. She was a very intelligent woman."

H. Kennerly Hooker, the defendant, testified as follows:

"I am the defendant in this case. I am 42 years old. Live in Calhoun county, about eight miles from Woodford. Am a married man. Gelba Hooker is my oldest child. I have ten children younger than her. Youngest child is about 6 years old. I had both the will prepared and later the deed prepared. Both done at my mother's suggestion. The will has been in my possession since it was signed. My father and mother came to live with me in the spring of 1915. She had been there a few days before she signed the deed. She could write. I was present when she signed the deed; it was Monday evening about a half hour before sundown. I carried the deed home after she signed it. Afterwards I had it probated, then had it recorded. I paid the taxes on the property and kept up the insurance. These are four tax receipts. I have paid all the taxes since my mother gave me a deed to the property. I took out policies of insurance for $1,500 and have kept it insured ever since she signed the deed. Q. Mr. Hooker, state how the title deed came to get out of your possession. A. My father asked me to let him see the deed. He gave it to my mother and she put it in her trunk. That is how they got possession of it. This was after the deed had been recorded. I

didn't collect the rents because I told my mother she could have the use of the property as long as she lived. I demanded the rent a while before she died, about two months before she died. She didn't pay the taxes as far as I know. After her death I again demanded the rent of the agent, but he refused to pay it to me. I negotiated a loan on this property from Miss Nathans' mortgage dated September 30, 1915. This mortgage is still on the property and unpaid. My father and mother moved away from my house because they wanted to; they asked me to move them to Dr. Salley's, which I did. I was willing to keep them there, but they seemed to be dissatisfied. After they claimed I fooled them into signing the deed they became dissatisfied, you know. That is the time they got dissatisfied, and moved back. I told them if they wanted to move all right, but if they wanted to stay they were welcome to stay. My mother helped around the house a little. She acted just as she always did. She could read, wash dishes, and drew a few buckets of water. She could converse about current matters of the day normally, as she always could."

Cross-Examination: "In the will my mother sent me from Columbia my father was to have a life estate. There is no provision in the deed under which I now claim for a life estate in my father. I had the deed prepared at her request. I gave her no money for the deed. The deed does not carry out the purpose of the will to give my father a life estate. I can read and write a little. I have been to school. The deed makes my interest more certain, not that of my father's. I deny that I threw the paper in my mother's lap in response to a demand from her to give her back title to the property. I never did ask for the deed back, but he promised to give it back. Q. You haven't at any time had possession of the property? A. No, sir; I haven't had pos-

session of it. I tried to get possession of the rents from the property before my mother died. This was a few months before she died. I did not try to get possession just after the deed was signed. I came to see the tenant, Mr. Sloan, and talked to him about it, paying me the rent, and he said he had been paying my father, Mr. J. J. Hooker, but that he didn't want to pay the wrong party. I then consulted my father about it. I also got Mr. Middlebrooks, a real estate agent, to see if he could collect the rents. I didn't get possession as a result of this, and I haven't possession yet. I applied for the loan from Miss Nathans a while after I got this deed. I was negotiating for the loan for some time, probably two months, before I got it. I got all the proceeds of this loan. I didn't give my mother or father any of it. I am not supporting my father, and haven't supported either my father or mother since they left my house shortly after the deed was executed. I didn't furnish or suggest to my mother that she get independent advice before signing the deed to me."

Redirect Examination: "My house is and has always been open to my father and mother. I am willing to take care of them if they will come and stay with me. My house is a six-room house. Q. Did your mother make any demand upon you as a result of which you put the paper in her lap? A. Did she make any demand on me? Yes; she came to me and asked me to give her the deed back to her property; that Marie said I had treated her wrong."

*Messrs. DePass & DePass,* for appellant, cite: *Relationship of parties and facts and circumstances of case raise a presumption of undue influence:* 29 Cyc. 1657; 90 S. E. 196; 87 S. C. 1; 24 S. C. 1; 110 S. C. 407.

*Messrs. A. J. Hydrick* and *Melton & Belser,* for respondent, cite: *Relation of parent and child does not raise pre-*

*sumption of undue influence:* 29 Cyc. 1657; 2 Pom. Eq. (3d Ed.), sec. 962; 14 Cyc. 195.

December 22, 1919.

The opinion of the Court was delivered by Mr. Chief Justice Gary.

In his decree, his Honor, the County Judge, says: "The sole question is whether there was such misrepresentation or undue influence as would vitiate the deed to the defendant from his mother. * * * In the cause at bar we have in dispute, a deed from mother to son. Does that relationship, *ipso facto*, raise a presumption of undue influence, the burden of rebutting which would be with the defendant? It does not. * * * There being no presumption of either undue influence or misrepresentation from mere relationship, has the plaintiff proven either? I hold not. Indeed, did the presumption of undue influence exist, my finding would be that it had been met by the defendant and overcome."

The following authorities show that there was error on the part of his Honor, the County Judge, in ruling that there was no presumption of undue influence arising from the relation of parent and child, and that the burden of proof rested upon the plaintiff: *Way v. Ins. Co.,* 61 S. C. 501, 39 S. E. 742; *Craddock v. Weekley,* 85 S. C. 329, 67 S. E. 308; *Huguenin v. Adams,* 110 S. C. 407, 96 S. E. 918.

Not only was there a failure on the part of the defendant to give a satisfactory explanation of the transaction between him and his mother, but the testimony in behalf of the plaintiff clearly shows that there was undue influence on the part of the defendant.

Mr. Justice Hydrick did not sit, because related to one of the parties.